IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

DENA RENEE DORSEY,

                Plaintiff,                              No.  06:12-cv-00530-HZ

     v.

MICHAEL J. ASTRUE,                      OPINION & ORDER
Commissioner of Social Security,

                Defendant.

Kathryn Tassinari
DREW L. JOHNSON, P.C.
1700 Valley River Drive
Eugene, Oregon 97401

       Attorney for Plaintiff

S. Amanda Marshall
UNITED STATES ATTORNEY
District of Oregon
/ / /
/ / /
/ / /

1 - OPINION & ORDER

Adrian L. Brown
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97201-2902

Leisa A. Wolf
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104-7075

     Attorneys for Defendant

HERNANDEZ, District Judge:

     Plaintiff Dena Dorsey brings this action seeking judicial review of the Commissioner's final decision to deny supplemental security income (SSI). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1382(c)(3)). I reverse the Commissioner's decision and remand for additional proceedings.

## PROCEDURAL BACKGROUND

     Plaintiff applied for SSI on April 29, 2007, alleging an onset date of February 24, 2003, which she later amended to April 19, 2007. Tr. 9, 92-99. Her application was denied initially and on reconsideration. Tr. 55-58, 62-67.

     On December 20, 2010, plaintiff appeared, with counsel, for a hearing before an Administrative Law Judge (ALJ). Tr. 26-48. On January 20, 2011, the ALJ found plaintiff not disabled. Tr. 6-23. The Appeals Council denied review. Tr. 1-4.

## FACTUAL BACKGROUND

     In her initial Disability Report, plaintiff alleged disability based on a back injury, "cccms," post-traumatic stress disorder, and hepatitis C. Tr. 108. In an updated report, she

2 - OPINION & ORDER

included gallstones, depression, and chronic fatigue as new illnesses. Tr. 170. At the time of the

hearing, she was fifty-two years old. Tr. 28. She did not graduate from high school, but she

completed a General Equivalence Diploma (GED). Tr. 30. She has past relevant work

experience as an in-home caregiver, janitor, billing and invoicing clerk, deli worker, and

customer service representative at a dry cleaning business. Tr. 17. Because the parties are

familiar with the medical and other evidence of record, I refer to any additional relevant facts

necessary to my decision in the discussion section below.

SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which . . . has lasted or can be

expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

Disability claims are evaluated according to a five-step procedure. See Valentine v.

Comm'r, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step

procedure to determine disability). The claimant bears the ultimate burden of proving disability.

Id.

In the first step, the Commissioner determines whether a claimant is engaged in

"substantial gainful activity." If so, the claimant is not disabled. Bowen v. Yuckert, 482 U.S.

137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner

determines whether the claimant has a "medically severe impairment or combination of

impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the

claimant is not disabled.

In step three, the Commissioner determines whether plaintiff's impairments, singly or in

combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. Yuckert, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. Yuckert, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets his burden and proves that the claimant is able to perform other work which exists in the national economy, the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since her alleged onset date through her date of last insured. Tr. 11. Next, at step two, the ALJ determined that plaintiff has severe impairments of (1) degenerative disc and joint disease of the lumbar spine, status post open reduction and fusion; (2) hepatitis C with chronic fatigue; (3) osteopenia of the left foot; (4) osteoporosis; (5) gallstones; and (6) headaches. Id. However, at step three, the ALJ found that the impairments did not meet or equal, either singly or in combination, a listed impairment. Tr. 13.

At step four, the ALJ concluded that plaintiff had the RFC to perform light work, with the following restrictions: (1) she can lift, carry, push, and pull up to ten pounds without restriction,

up to twenty-five pounds frequently, and up to forty pounds occasionally; (2) she can stand and/or walk for six hours in an eight-hour workday with normal breaks; (3) she can sit for six hours in an eight-hour workday with normal breaks; and (4) she can occasionally bend, stoop, squat, kneel, or climb.  Tr. 14.

With this RFC, the ALJ determined that plaintiff was able to perform her past relevant work as a customer service representative at a dry cleaning business.  Tr. 17-18.  Alternatively, at step five, the ALJ relied on the Medical-Vocational Guidelines ("the grids") to determine that plaintiff was able to perform jobs that exist in significant numbers in the economy.  Tr. 18-19.  As a result, the ALJ determined that plaintiff was not disabled.  Id.

STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole.  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (internal quotation omitted).  The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision.  Id.; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed."  Vasquez, 572 F.3d at 591 (internal quotation and brackets omitted); see also Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation omitted).

5 - OPINION & ORDER

DISCUSSION

Plaintiff contends that the ALJ erred in the following respects:  (1) the ALJ improperly

rejected plaintiff's testimony; (2) the ALJ failed to include certain impairments at steps two and

four; (3) the ALJ improperly rejected the opinions of several treating and examining physicians;

(4) the ALJ failed to address lay evidence; and (5) as a result of these errors, the ALJ improperly

concluded that plaintiff could perform her prior job as a customer service clerk at a dry cleaners

or could perform other jobs in the economy.

I. Plaintiff's Testimony

At the hearing, plaintiff testified that she experiences back and hip pain as well as chronic

headaches.  Tr. 42.  She described her back pain as constant, with a baseline level of four out of a

one-to-ten scale, with "pain spikes" once or twice daily.  Id.  During these "pain spikes" she

experiences pain on a level of six to eight on the ten-point scale, for an hour to an hour and one-

half.  Id. at 43.  A variety of activities such as doing her laundry or the dishes, as well as walking,

standing, or lifting, can trigger a pain spike which is why plaintiff spends much of her time

watching television.  Id.  She takes methadone[1] three times per day for her pain, and Xanax[2] for

her headaches.  Tr. 40.

Plaintiff believed she could stand for thirty minutes and walk for about twenty minutes

before needing to sit or lie down.  Id. at 44.  She thought she could sit for about an hour or an

hour and one-half before needing to change position.  Id.  She switches positions from sitting to

---

[1] A pain reliever.  See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682134.html.

[2] An anti-anxiety medication.  See
http://www.nlm.nih.gov/medlineplus/druginfo/drug_Xa.html.

lying down and back again to relieve the pain.  Id.  She can lift a gallon of milk and a "little" bag of groceries but she does not lift much of anything else.  Id.

Plaintiff's pain interferes with her ability to concentrate.  Tr. 45.  She is also unable to remember appointments without writing them down.  Id.

She experiences headaches almost every day.  Id.  Plaintiff described that the pain is almost as bad as a migraine and feels like her head is in a vise being squeezed.  Tr. 46.  She rated the pain level as a nine on a ten-point scale.  Id.  She is also fatigued all the time from her hepatitis C.  Tr. 46-47.  She sleeps a total of about six hours per night because she wakes up almost every hour or hour and one-half.  Tr. 46.  She also cat naps during the day, for ten to fifteen minutes at a time.  Id. at 47.

As for her activities of daily living, plaintiff testified that she lives with her mother, who is eighty years old, and that her sister lives close by.  Tr. 35-36.  Her sister helps her do things like change the sheets on the bed and grocery shop.  Tr. 36-37.  Her sister vacuums for her.  Tr. 36.  Plaintiff does not mop the floor or clean the bathroom.  Id.  She does her own laundry, but after she finishes folding it, she has to lie down.  Id.  She makes meals only once or twice each week, and otherwise eats TV dinners.  Id.  When she does go grocery shopping with the help of her sister and mother, she lasts only about twenty minutes in the store.  Tr. 37.  She does not mow the lawn or garden other than sometimes picking things off the vine or pulling a weed or two.  Tr. 37-38.  She described having a couple of good days each month when she has a little bit of energy, but other than that, she does no yard work.  Tr. 38.  On a typical day, she watches television for most of the day.  Tr. 39.

The ALJ found plaintiff's allegations of pain and fatigue not credible.  Tr. 17.  He noted

that despite alleging constant pain, plaintiff had routinely "presented to care" in no acute distress. Id. Despite alleging physical difficulties, physical examinations by treating sources had revealed generally mild findings. Id. Plaintiff had demonstrated full motor strength in her extremities and no significant neurological deficits. Id. Although she alleged difficulty walking, she had demonstrated ambulation "without difficulty" on multiple occasions. Id. And, her allegations were disproportionate to the generally mild radiological findings about the spine. Id.

The ALJ further noted that plaintiff reported her fatigue as "intermittent" and on another occasion she denied fatigue. Id. She had also previously indicated that her headaches had improved, and at one point, denied having headaches. Id. Her pain medications were tapered and she was advised to return to work. Id. A treating source found no basis for her complaints of lack of coordination and her pain had been characterized as "merely slight to moderate, intermittent, and rare to occasional when she is medicated." Id.

The ALJ is responsible for determining credibility. Vasquez, 572 F.3d at 591. Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering. Carmickle v. Comm'r, 533 F.3d 1155, 1160 (9th Cir. 2008) (absent affirmative evidence that the plaintiff is malingering, "where the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains, an adverse credibility finding must be based on 'clear and convincing reasons'").

When determining the credibility of a plaintiff's complaints of pain or other limitations, the ALJ may properly consider several factors, including the plaintiff's daily activities,

8 - OPINION & ORDER

inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence.  Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995).  The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain.  Id.

Additionally, the ALJ may consider objective medical evidence in determining a claimant's credibility regarding subjective symptom testimony, as long as the ALJ does not reject such testimony solely because it is unsubstantiated by the objective medical evidence.  20 C.F.R. §§ 404.1529(c), 416.929(c); Rollins v. Massanari, 261 F.3d 853, 856, 857 (9th Cir. 2001) ("Once a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain[;] . . .  While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects.") (internal quotation and brackets omitted) .

Plaintiff argues that the ALJ improperly made his own interpretation of the medical evidence, that evidence in the record does in fact reveal changes in her low back and pelvis which accounts for her pain, and that there is no evidence in the record establishing that a lack of neurological deficits is inconsistent with back pain.  Additionally, plaintiff suggests that the ALJ's rejection of plaintiff's testimony regarding her headaches and fatigue is inconsistent with his findings that plaintiff's severe impairments include headache and fatigue.

I agree with defendant that the ALJ did not err.  In stating that plaintiff's allegations were disproportionate to the mild radiological findings, the ALJ is not offering his own interpretation

of the medical evidence, but is observing that the objective medical evidence does not support

her claimed level of pain.  While the ALJ may not rely solely on the lack of objective medical

evidence to reject her subjective testimony, he also noted that plaintiff's allegations of pain were

inconsistent with her previous reports of intermittent or no fatigue and her previous reports of

improvement in, or lack of, headache pain.  Finding that her claimed level of pain is inconsistent

with her prior self-reports is a clear and convincing basis for rejecting her pain testimony.

Moreover, rejecting her pain testimony for this reason is not inconsistent with the ALJ's

step two severity findings.  The "step-two inquiry is a de minimis screening device to dispose of

groundless claims."  Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996).  Finding that

plaintiff's fatigue or headache is a severe impairment is not conclusive of the functional

limitations caused by the fatigue or headache.  The ALJ gave clear and convincing reasons in

support of his rejection of plaintiff's subjective testimony.

II.  Severe Impairment Findings at Steps Two and Four

Plaintiff argues that the ALJ erred by failing to include borderline intellectual

functioning, post-traumatic stress disorder, and depression as severe impairments at steps two

and four of the sequential analysis.  I agree with plaintiff that the ALJ erred at step two as to the

borderline intellectual functioning.  However, I agree with defendant that the ALJ did not err in

finding her depression and post-traumatic stress disorder to be non-severe.  Additionally, I reject

defendant's contention that the ALJ's error at step two was harmless.

A.  Step Two

The ALJ considers the severity of the claimant's impairment(s) at step two.  20 C.F.R. §§

404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the claimant does not have a severe medically

determinable physical or mental impairment that meets the duration requirement, or a

combination of impairments that is severe and meets the duration requirement, the claimant is

not disabled.  Id.  A severe impairment is one that significantly limits the claimant's physical or

mental ability to do basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).

"[T]he severity regulation is to do no more than allow the [Social Security

Administration] to deny benefits summarily to those applicants with impairments of a minimal

nature which could never prevent a person from working."  Soc. Sec. Ruling (SSR) 85-28

(available at 1985 WL 56856, at *2) (internal quotation omitted).  "[A]n ALJ may find that a

claimant lacks a medically severe impairment or combination of impairments only when his

conclusion is 'clearly established by medical evidence.'"  Webb v. Barnhart, 433 F.3d 683, 687

(9th Cir. 2005) (quoting SSR 85-28).  The court's task in reviewing a denial of benefits at step

two is to "determine whether the ALJ had substantial evidence to find that the medical evidence

clearly established that [the claimant] did not have a medically severe impairment or combination

of impairments."  Id.

At step two, the ALJ noted that in March 2004, plaintiff had diagnoses of post-traumatic

stress disorder, depressive disorder, and polysubstance dependence.  Tr. 12 (citing Tr. 199).  At

the time, her Global Assessment of Functioning (GAF) score was 58, indicating moderate

symptoms or moderate difficulty in social, occupational, or school functioning.  Id. (citing Tr.

199).  However, on that same date, the treatment notes stated that she presented as "slightly"

depressed and otherwise was "within normal limits" on a mental status examination.  Id. (citing

Tr. 196).

The ALJ then noted that plaintiff was examined by psychologist Dr. Deborah Schmidt,

Ph.D., in October 2004, who assessed her as having post-traumatic stress disorder, major

depression, opiod dependence (reportedly in remission), and borderline intellectual functioning.

Id. (citing Tr. 191).  Dr. Schmidt assessed her GAF as 55.  Tr. 191.  The ALJ then cited the

October 2007 report by consultative psychiatric examiner Dr. Timothy Canty, M.D., who

assessed her as having poly-substance abuse in long-term remission, but found no other

psychiatric diagnoses.  Tr. 12 (citing Tr. 346).

       Despite the 2004 assessments of post-traumatic stress disorder, depression, and borderline

intellectual functioning, the ALJ found none of these to be severe impairments at step two.  He

explained that plaintiff attributed many of her limitations to her pain, not her mental

impairments, and had reported that she did light chores as tolerated, handled her own money,

made her own meals, and did her own shopping. Tr. 12 (citing Tr. 188, 345).  The ALJ also noted

that plaintiff socializes with others and gets along with others, including authority figures.  Id.

(citing 135-42).  He discounted her assertion that she is unable to focus due to her pain

medications and has a poor memory because she demonstrated no significant concentration

difficulties during any treating or examining source mental status examination.  Tr. 13.  Finally,

there were no records demonstrating any extended episodes of decompensation.  Id.  Based on

this evidence, the ALJ concluded that plaintiff's medically determinable mental impairments

caused no more than mild limitations and thus, were not severe at step two.  Tr. 13.

       The ALJ erred in part because the fact that plaintiff can perform certain chores, socialize,

and successfully completed mental status examinations is not inconsistent with a diagnosis of

borderline intellectual functioning.  Dr. Schmidt's opinion that plaintiff would need restrictions

to simple tasks indicates more than a mild impairment and thus, the borderline intellectual

functioning diagnosis cannot be dismissed as non-severe at step two. Additionally, although Dr.

Canty believed plaintiff's functioning to be higher than that suggested by the 2004 testing, Dr.

Canty administered no tests and thus, there is no objective medical evidence contradicting Dr.

Schmidt's diagnosis and limitations. Moreover, defendant concedes that the ALJ erred in failing

to mention plaintiff's borderline intellectual functioning at step two, but argues that the error was

harmless because the ALJ considered the borderline intellectual functioning at step four in

formulating his RFC. Def.'s Mem. at 5.

As to plaintiff's depression and post-traumatic stress disorder, the ALJ did not err at step

two because, as the ALJ found, these impairments do not appear to have caused more than mild

limitations in functioning. As the ALJ mentioned, the first diagnosis of post-traumatic stress

disorder and depression in March 2004 came with a contemporaneously-made treatment note

indicating that plaintiff was only "slightly" depressed and that the rest of her mental status

examination was within normal limits. Although Dr. Michael Yang prescribed Cymbalta, he

never listed depression or post-traumatic stress disorder as a diagnosis and made no findings

regarding any limitations caused by her depression which he noted was plaintiff's own report.

Tr. 325, 327. Additionally, while Dr. Beth Blumenstein at one point prescribed Celexa[3], she also

did not make a diagnosis of depression, referring only to plaintiff's history of it as noted in

plaintiff's prior medical records, and she made no indication of any functional limitations caused

by depression. As a result, the ALJ did not err in concluding that plaintiff's depression and post-

traumatic stress disorder were not severe impairments.

---

[3] Both Cymbalta and Celexa are anti-depressants. See
http://www.nlm.nih.gov/medlineplus/druginfo/drug_Ca.html

13 - OPINION & ORDER

B.  Step Four - Harmless Error

Defendant argues that the ALJ's step two error regarding borderline intellectual functioning was harmless.  An ALJ's error in the severity determination at step two is harmless where the ALJ considers any limitations posed by the impairment at step four.  Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007).  Here, the ALJ assessed no limitations related to plaintiff's borderline intellectual functioning as part of his RFC at step four.

Defendant argues that because the ALJ relied on Dr. Davis in rendering his RFC, and because Dr. Davis considered plaintiff's 2004 psychological examination which, defendant argues, necessarily included the intelligence testing, but still found no significant mental impairment, the ALJ considered plaintiff's borderline intellectual functioning in his RFC.

I disagree.  Although Dr. Davis specifically mentioned plaintiff's reported post-traumatic stress disorder and depression, he did not mention her intellectual functioning.  Therefore, it cannot be presumed that he considered the borderline intellectual functioning assessment by Dr. Schmidt.

I also reject defendant's argument because there is no legal support for an ALJ to repair a step two error at step four by crediting a nonexamining agency psychologist's report (which does not mention the erroneously omitted severe impairment) over the examining practitioner's uncontradicted opinion.  The step two error in failing to find plaintiff's borderline intellectual functioning to be a severe impairment was not harmless.

III.  Opinions of Treating and Examining Physicians

Plaintiff argues that the ALJ improperly rejected the opinions of Drs. Espino, Yang, Blumenstein, Ferrero, and Schmidt.  Generally, social security law recognizes three types of

14 - OPINION & ORDER

physicians:  (1) treating, (2) examining, and (3) nonexamining.  Holohan v. Massanari, 246 F.3d 1195, 1201-02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  More weight is given to the opinion of a treating physician than to the opinions of those who do not actually treat the claimant.  Id.; 20 C.F.R. §§ 1527(d)(1)-(2), 416.927(d)(1)-(2).

If the treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight.  Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007); Holohan, 246 F.3d at 1202.  If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the ALJ must still articulate the relevant weight to be given to the opinion under the factors provided for in 20 C.F.R. §§ 1527(d)(2), 416.927(d)(2).  Orn, 495 F.3d at 631.

"To reject an uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence. If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005).  "'The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician.'" Hill v. Astrue, 698 F.3d 1153, 1160 (9th Cir.2012) (quoting Lester, 81 F.3d at 831).

A.  Deborah Schmidt, Ph.D

Dr. Schmidt examined plaintiff in October 2004.  Tr. 186-92.  She conducted a clinical interview and mental status examination, reviewed plaintiff's records, and administered several

tests.  Tr. 186.  One of the tests was the Wechsler Adult Intelligence Scale - III (WAIS-III) which showed that plaintiff had intellectual functioning in the borderline range with a Full Scale IQ of 77 and a Verbal IQ of 78.  Tr. 189.  Her Performance IQ of 80 was in the low average range.  Id. Dr. Schmidt explained that plaintiff's WAIS-III scores suggested that she "possesses slightly below average numerical and logical reasoning abilities" and "slightly below average attention, concentration, and sequential learning ability."  Tr. 190.  The scores also showed that plaintiff "possesses poor social judgment" along with "difficulty understanding social rules and regulations."  Id.  Additionally, her WAIS-III scores showed that she "possesses slightly below average visual-motor coordination and perceptual organization" and "borderline visual acuity and ability to perceive the whole in relation to its parts."  Id.   Other testing revealed short-term memory problems, with difficulty retaining information for periods of time over twenty minutes. Tr. 190-91.

Dr. Schmidt rendered the following diagnoses:  post-traumatic stress disorder; major depression, moderate, recurrent, without psychotic features; opiod dependence, reportedly in remission; and borderline intellectual functioning.  Tr. 191.  She explained that based on the test results, plaintiff possessed the intellectual ability to carry out and understand mostly simple instructions and tasks and would likely have difficulty completing most tasks of moderate complexity.  Id.  She is able to follow simple, repetitive instructions.  Id.  Her short-term memory problems would likely interfere with her ability to perform some tasks in a work setting.  Tr. 191-92.

The ALJ gave three reasons for rejecting Dr. Schmidt's opinions.  Tr. 16.  First, the ALJ noted that her opinions were made in October 2004, more than two years before plaintiff's

16 - OPINION & ORDER

revised onset date and as such, the opinions addressed plaintiff's functioning during an irrelevant time period. Id. Second, he noted that her opinions were inconsistent with a "treating source" finding rendered seven months earlier which noted that plaintiff "presented slightly depressed but was otherwise within normal limits of the [mental status examination] during the interview." Id. Third, he found that her opinions were largely based on plaintiff's subjective complaints rather than objective testing. Id.

I agree with plaintiff that the ALJ erred in rejecting Dr. Schmidt's opinion in regard to plaintiff being limited to simple instructions and tasks. First, while ordinarily an opinion issued before the onset date is of little relevance, Carmickle, 533 F.3d at 1166, there is no subsequent testing record suggesting that plaintiff's intellectual functioning improved at any time. Dr. Canty examined plaintiff in October 2007 and rendered a diagnosis of polysubstance abuse in long-term remission, but he did not issue the WAIS-III or any similar intelligence test. Tr. 344-47. Without an explanation of why plaintiff's objectively-tested borderline intelligence would change over time, it was error for the ALJ to reject Dr. Schmidt's opinion on the basis that the testing and opinion occurred in 2004.

Second, the inconsistent prior opinion from a "treating source" is not a valid basis for rejecting Dr. Schmidt's opinion because it was rendered by a social worker without any testing, making the basis of the opinion unclear. Tr. 196. Social workers are not acceptable medical sources, but are "other sources" whose opinions are entitled to less weight than those of licensed psychologists such as Dr. Schmidt, an acceptable medical source. 20 C.F.R. §§ 404.1513(a), (d), 416.913(a), (d). Additionally, while the ALJ referred to this as a statement from a "treating source," my review of the cited record indicates that this particular social worker met with

17 - OPINION & ORDER

plaintiff once - on March 24, 2004.  Tr. 196.  This is not a treating relationship.

Third, Dr. Schmidt's opinion regarding plaintiff's borderline intellectual functioning, and thus, her opinion on plaintiff's limitation to simple instructions and tasks, was not based on plaintiff's subjective reports.  Rather, it was based on objective testing.

I agree with plaintiff that the ALJ improperly rejected Dr. Schmidt's findings regarding plaintiff's intellectual capacity and her limitations to simple, repetitive tasks and instructions.

B.  Dr. Michael Yang, M.D.

Plaintiff began treating with pain management specialist Dr. Yang in October 2006.  Tr. 33-36.[4]  He noted her significant history of back injuries, caused by being run over by a truck in 2002 and resulting in several surgeries.  Tr. 333.  He also noted her recent workplace injury where she fell while working at the dry cleaners, striking her lower back, upper back, neck, and head on the floor.  Id.  Although plaintiff's initial 2002 back injury had "essentially resolved," the recent fall triggered pain up and down her entire back and constant headaches.  Id. She rated it a seven on a ten-point scale.  Id.

Of relevance here, Dr. Yang noted that plaintiff had a normal free gait, although she walked slowly.  Tr. 335.  He noted her limited forward mobility of her back, specifically mentioning that she could barely get her hands to the level of her knees.  Id.  Her side-to-side flexion was only about ten degrees and she had a significant amount of pain with trying to twist or rotate.  Id.  Her straight leg raise was positive mildly in both joints.  Id.

Dr. Yang saw plaintiff again on December 4, 2006.  Tr. 331-32.  He noted her continued

---

[4]  The fourth page of Dr. Yang's four-page new patient consultation report appears to be missing from the record.  Tr. 33-36.

complaints of severe pain.  Tr. 331.  On physical examination, her gait was still slow, and her

back was very stiff and tender to palpation.  Id.  She was barely able to flex and extend her back.

Id.  Dr. Yang diagnosed plaintiff with lumbar degenerative disc disease, history of chronic low

back pain and back injury status post surgery at least "x 2," and severe low back pain status post

her new injury in July 2006.  Id.

      Dr. Yang recommended that she have a new lumbar MRI as a result of the new injury and

that she have a lumbar epidural steroid injection because of the "intractable low back pain with

[the] new injury."  Tr. 332.  He slightly increased her Norco[5] from 60 tablets per month to 90

tablets per month.  Id.  Finally, he spent a "lengthy time" discussing plaintiff's work status.  Id.

Plaintiff reported that she had problems standing for more than five to ten minutes and was not

able to walk one block without pain.  Id.  He opined that she should be off of work for three to

six months.  Id.; see also Tr. 330 (December 29, 2006 Progress Report to Worker's

Compensation Division noting that plaintiff was to be off work until June 30, 2007).

      Dr. Yang saw plaintiff approximately once per month into April 2007.  Tr. 325-29.  In

February 2007, plaintiff continued to report severe low back pain.  Tr. 328.  Dr. Yang continued

to observe her slow gait.  Id.  His diagnoses on this occasion were lumbar postlaminectomy

syndrome and lumbar and thoracic spine degenerative disc disease.  Id.  He had previously

switched her to methadone from Norco, Tr. 329, and increased it at the February visit from ten

milligrams three times per day, to ten milligrams four times per day.  Id.  In March 2007, plaintiff

reported continued severe low back pain, present 100% of the time, and rated it as a five to six on

_____

     [5] A pain-killing drug containing acetaminophen and hydrocodone.  See
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html#brand-name-2.

a ten-point scale with medication, and seven to eight on a ten-point scale without medication.  Id.
Her gait remained slow and her back was tender to palpation at the mid-thoracic level and below.
Tr. 327.  Dr. Yang added Cymbalta as a medication and continued to note that he still had not
received her complete medical record which was relevant to "mak[ing] some treatment
decisions."  Id.

 Plaintiff's last visit with Dr. Yang was on April 13, 2007.  Tr. 325.  She again complained
of severe low back pain, radiating into her mid-back, along with dizziness, sleep problems, and
depression.  Id.  Dr. Yang noted her slow gait and tenderness to palpation as he had done before.
Id.  He noted that she had wider tenderness in the S/I area.  Id.  He added Flexeril[6] in addition to
the methadone and indicated she was going to re-try Cymbalta which she stopped after only a
few doses because of gastrointestinal side effects.  Id.

 The ALJ gave little weight to Dr. Yang's opinion that plaintiff could not work from
December 29, 2006 through June 30, 2007.  Tr. 14-15.  First, the ALJ discounted Dr. Yang's
opinion because he did not have the benefit of reviewing plaintiff's medical records to "make
some treatment decisions."  Tr. 15.  Second, he found that the opinion was unsupported by his
own findings which were mild and at most noted paraspinal tenderness.  Id.  Third, he discounted
the opinion because Dr. Yang examined plaintiff only two times before issuing the work
restriction.  Id.

 Plaintiff argues that the ALJ improperly rejected Dr. Yang's opinion because while he did
not have her prior medical records, he conducted his own examination, finding her back stiff,
tender to palpation, and extremely limited in flexion and extension.  Plaintiff further contends

---

 [6]  A muscle relaxant.  See http://www.nlm.nih.gov/medlineplus/druginfo/drug_Fa.html.

20 - OPINION & ORDER

that the fact that Dr. Yang examined her only twice before issuing the work restriction goes to the weight of his opinion, if contradicted by other examining or treating doctors, and here, there is no such conflict.

I agree with plaintiff.  The lack of access to her prior medical records does not detract from an opinion based on a current physical examination.  And, while Dr. Yang wanted to review those records in order to "make some treatment decisions," the record shows that he was, in fact, treating her based on his assessment of her current condition.  I also agree with plaintiff that Dr. Yang's work-restriction opinion is not inconsistent with his findings.  He expressly noted her extremely limited forward mobility and side-to-side flexion, as well as her "very stiff" back which was tender to palpation.  These are more than mild findings and the ALJ erred by rejecting Dr. Yang's opinion on this basis.

I also agree with plaintiff that the ALJ erred by rejecting Dr. Yang's opinion because it was rendered after only two visits.  When a "treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record, [the Commissioner] will give it controlling weight."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  When a treating physician's opinion is not given controlling weight, it is still entitled to deference and must be evaluated by applying several factors, including the length of the treatment relationship.  20 C.F.R. § 404.1527(d)(2)-(d)(6); 20 C.F.R. § 416.927(d)(2)-(d)(6); see also Orn, 495 F.3d at 631 (if a treating physician's opinion is not given controlling weight because it is not "well supported" or because it is inconsistent with other substantial evidence in the record, the ALJ is to consider specified factors in determining the

weight it will be given, including the length of the treatment relationship and the frequency of examination by the treating physician and the nature and extent of the treatment relationship between the patient and the treating physician).

The length of the treating relationship is not relevant unless the ALJ first determines that the treating physician's opinion is not well supported and is inconsistent with other medical evidence in the record. Given that the ALJ erred in concluding that Dr. Yang's opinion was not supported by his findings, and there are no inconsistent opinions from treating or examining sources regarding plaintiff's ability to work during this six-month period, the ALJ should have given Dr. Yang's work-restriction opinion controlling weight. Moreover, even if it was proper to consider the number of times he had examined her prior to offering his opinion, the ALJ failed to note that the treatment relationship continued for several more months and Dr. Yang continued to keep plaintiff off of work.

The ALJ erred in rejecting Dr. Yang's opinion.

C. Dr. Julian Espino, M.D.

On August 18, 2007, plaintiff was examined by internal medicine physician Dr. Espino. Tr. 337-41. At the time, plaintiff was experiencing constant mid-back pain and burning pain in the low back, made worse with standing or walking for more than thirty minutes and requiring her to frequently change position. Tr. 337. She also reported having difficulty with bending, squatting, or kneeling. Tr. 337-38. She was taking methadone for pain. Tr. 338. She also reported chronic fatigue and "dull" headaches which were exacerbated by upper back pain. Id. She could do most of her chores, but had to rest in between due to pain. Id. She began her day with a shower, but then had to lie down to ease her pain. Id.

22 - OPINION & ORDER

On physical exam, she was not in any obvious distress.  Tr. 339.  Her cervical spine range

of motion was "grossly normal," but her lumbar spine range of motion was restricted to sixty

degrees of flexion, twenty-five degrees of extension, and forty-five degrees of bilateral rotation.

Tr. 340.  She also had paravertebral tenderness of the thoracic area.  Id.  Her strength was a 5/5

throughout her upper and lower extremities.  Tr. 341.

Dr. Espino diagnosed plaintiff as having chronic thoracic back pain with a history of an

L1 burst fracture from a motor vehicle accident with a history of fusion.  Id.  He stated that her

examination revealed a reduced range of motion without any neurological signs of radiculopathy.

Id.  He also diagnosed her as having chronic hepatitis C with chronic fatigue, and chronic

headaches.  Id.

In assessing her functional limitations, Dr. Espino concluded that she could stand, walk,

and sit for thirty minutes at a time for a total of four hours in an eight-hour workday.  Id.  She

could lift, carry, push and pull objects up to ten pounds with no restrictions, from eleven to

twenty-five pounds frequently, and from twenty-six to forty pounds occasionally.  Id.  She could

occasionally bend, stoop, squat, kneel, or climb.  Id.  All of these restrictions were based on her

chronic back pain.  Id.  He found no restrictions on reaching or performing fine or gross motor

movements.  Id.

The ALJ accepted all of Dr. Espino's opinions except for his limitations on plaintiff's

ability to stand, walk, and sit.  The ALJ noted that nonexamining state agency physicians had

pointed out that Dr. Espino's opinion was inconsistent with his findings which showed a normal

gait, normal straight leg raise, and intact neurological signs.  Tr. 14.  As such, the ALJ gave more

weight to the nonexamining physicians' opinions that plaintiff could stand and/or walk for about

six hours in an eight-hour day, with normal breaks, and could sit for six hours in an eight-hour day, with normal breaks.  Id.

Plaintiff argues that the ALJ erred because Dr. Espino's opinion was based on a review of plaintiff's medical records, including records from her prior back surgery, and his physical examination which found a reduced range of motion in her back and paravertebral tenderness. Plaintiff also argues that the opinion of the nonexamining physician is insufficient, by itself, to constitute substantial evidence to reject the examining doctor's opinion.

The ALJ erred.  The ALJ relied on the state reviewing physician's explanation for why the sit, stand, and walking restrictions given by Dr. Espino were not reliable.  But, the opinion of a nonexamining physician cannot, by itself, constitute substantial evidence used to justify rejection of an examining physician.  That is essentially what the ALJ did here.

Even if the ALJ had independently concluded that Dr. Espino's sitting, standing, and walking limitations were inconsistent with his findings, the ALJ's determination is not supported by the evidence.  As plaintiff notes, while some findings were within normal limits, there still were significant findings upon physical examination.

The ALJ erred in rejecting Dr. Espino's sitting, standing, and walking limitations.

D.  Dr. D.B. Ferrero, D.C.

Dr. Ferrero, a chiropractor, examined plaintiff on February 5, 2008 and August 5, 2008. Tr. 472-92; Tr. 500-16.  In his March 12, 2008 report regarding his February 5, 2008 examination, Dr. Ferrero noted that he obtained a history from plaintiff and conducted a physical examination.  Tr. 472.  He did the same at the August 5, 2008 examination as stated in his September 5, 2008 report.  Tr. 500.  On both occasions, he also "reviewed all of the documents."

Tr. 472, 500.  In March 2008, Dr. Ferrero agreed with Dr. Yang that plaintiff should remain off

work on temporary disability.  Tr. 490.

In September 2008, Dr. Ferrero offered certain work restrictions based on plaintiff's

spinal impairments.  Tr. 512.  He opined that she be limited to light work, which he described as

working in a standing, walking, or sitting position "with minimum demands with physical effort"

and not lifting in excess of fifteen pounds "without assistance."  Tr. 512-13.  She should avoid

activities requiring repetition such as bending, stopping, lifting, pushing, pulling, and climbing,

or other activities with comparable physical effort.  Id.  He stated that with these restrictions, she

would be able to return to work.  Tr. 513.

The ALJ rejected Dr. Ferrero's March 2008 opinion because, as a chiropractor he is not an

acceptable medical source and because his opinion was made within the context of a worker's

compensation claim and "is therefore not necessarily probative of the claimant's functionality

within the meaning of the Social Security Act."  Tr. 15.  He also found it inconsistent with Dr.

Ferrero's September 2008 opinion in which he indicated that she could return to work, with

restrictions.  Id.

In social security cases, a  chiropractor is considered an "other source."  20 C.F.R. §§

404.1513(d)(1), 416.913(d)(1).  An ALJ may discount testimony from "other sources" if the ALJ

"gives reasons germane to each witness for doing so."  Molina v. Astrue, 674 F.3d 1104, 1111

(9th Cir. 2012).  Although Dr. Ferrero offered his opinion in the context of a worker's

compensation claim, that alone is not a valid basis for rejecting his opinion.  While it may be

"germane," to the witness's opinion, the ALJ fails to explain why it matters.  Without an

explanation of why Dr. Ferrero's assessment of plaintiff's functionality is influenced by the

context in which his opinion was sought, I reject this as a valid basis for rejecting his opinion.

The other reason offered by the ALJ is without foundation. The ALJ found that the March 2008 opinion regarding disability was inconsistent with the September 2008 opinion that plaintiff could work with restrictions. But, the ALJ does not appear to have appreciated that the March 2008 opinion was one of <u>temporary</u> disability. Thus, the September 2008 opinion that she could return to work with restrictions is consistent with, not inconsistent with, the March 2008 opinion.

The reasons given by the ALJ for rejecting Dr. Ferrero's "other source" opinion are without foundation and are not "germane" to the witness. The ALJ erred in rejecting Dr. Ferrero's opinion.

E. Dr. Beth Blumenstein, M.D.

Dr. Blumenstein was plaintiff's treating physician for much of 2009. Tr. 396-465. In February 2009, at the inception of her care with Dr. Blumenstein, plaintiff expressed a desire to decrease her use of methadone and eventually stop it. Tr. 450. She and Dr. Blumenstein agreed on a plan to taper her dosage over the next several months. Tr. 450-51. Dr. Blumenstein noted plaintiff's reports of chronic back pain, depression, sleep problems, fatigue, loss of balance, and frequent headache. Tr. 451. She also reviewed plaintiff's medical records, which plaintiff had brought with her, and noted plaintiff's history of depression, anxiety, hepatitis C, and several back problems, including chronic pain in her low back. <u>Id.</u> Other than taking her blood pressure and weight, and noting her general appearance, no other physical examination was conducted on the initial visit. <u>Id.</u>

On March 10, 2009, Dr. Blumenstein stated that plaintiff was unable to perform

customary or regular work for six months.  Tr. 465.   She noted plaintiff's chronic lumbar pain and degeneration.  Id.  In her chart notes from her examination of plaintiff on that date, Dr. Blumenstein reported that plaintiff appeared chronically ill and pale, and that she moved about the room with "some difficulty."  Tr. 449.  She also noted plaintiff's methadone dosage and again referred to the plan to taper her off it slowly, although she stated that plaintiff may not be able to completely stop taking it.  Tr. 449.  She also noted plaintiff's report of depression and plaintiff's willingness to try an anti-depressant.  Id.  Dr. Blumenstein spoke to plaintiff about going back to school "when she feels a bit better."  Id.  She noted that plaintiff indicated she would like to go back to school.  Id.  Dr. Blumenstein prescribed an anti-depressant and stated that "I have strongly suggested to the patient that she go back to school.  I think that it is depressing for her to be alone with her mother all day long when she should be out working and involving herself with other people."  Id.

The ALJ rejected Dr. Blumenstein's opinion that plaintiff could not work for six months beginning March 10, 2009, because "two days" later, Dr. Blumenstein advised plaintiff to taper her pain medication and to return to work.  Tr. 15.  The ALJ also remarked that as a family practitioner, she did not practice in a specialty such as neurosurgery which is more relevant to plaintiff's "more serious impairments."  Id.

A careful reading of the record shows that Dr. Blumenstein examined plaintiff on March 10, 2009, and completed the disability form in which she states that plaintiff cannot work for six months, on that same date.  Tr. 448-49 (chart note from March 10, 2009 stating that paperwork for California's long-term disability program completed); Tr. 465 (disability form showing Dr. Blumenstein signed on March 10, 2009).  Additionally, while plaintiff and Dr. Blumenstein

27 - OPINION & ORDER

together worked on plan to taper plaintiff off of her very high doses of methadone, Dr.

Blumenstein stated on that same date that plaintiff may not be able to go all the way off the drug.

In fact, in July 2009, plaintiff's methadone prescription was renewed for the next three months,

indicating that a complete tapering off of methadone was unsuccessful.  Tr. 440-41.  In October

2009, Dr. Blumenstein renewed the prescription again, for an additional three months.  Tr. 436.

Additionally, while Dr. Blumenstein talked to plaintiff about returning to school and

indicated that getting out of the house to work or go to school would help plaintiff's depression,

that is not inconsistent with her opinion that for the next six months, plaintiff was unable to

work.  Dr. Blumenstein's recommendation to plaintiff regarding school was for "when she felt

better" and her disability opinion was for six months.  These are not inconsistent statements.

The ALJ erred by rejecting Dr. Blumenstein's opinion because he failed to consider Dr.

Blumenstein's opinion regarding plaintiff's inability to work for six months in the context of her

chart notes.  Moreover, while Dr. Blumenstein is not a neurosurgeon, she was plaintiff's treating

physician and her opinion is entitled to controlling weight unless it is not "well-supported" or is

inconsistent with other substantial evidence in the record.  Here, the ALJ fails to assert that Dr.

Blumenstein's opinion is not well-supported and fails to establish that her opinion is inconsistent

with other substantial evidence in the record.  Therefore, her lack of specialization is not a clear

and convincing basis upon which to reject her opinion.

IV.  Lay Testimony

Plaintiff's brother Steve Dorsey, and her boyfriend John Luper, both completed Function

Reports regarding plaintiff's abilities.  Tr. 119-26 (Dorsey); Tr. 154-62 (Luper).  While the ALJ

acknowledged the information these witnesses provided in their reports, the ALJ did not further

28 - OPINION & ORDER

accept or reject their testimony.

Plaintiff argues this was error because these lay witness statements show that she has limitations on her ability to concentrate, is easily stressed, does little socializing, is short-tempered when stressed, and becomes confused and angry with changes in her routine. Defendant concedes that the ALJ erred, but argues that any error was harmless because the testimony does not support any specific functional limitations that could be attributable to medically determinable impairments which were established in the record independent of plaintiff's subjective complaints. Def.'s Mem. at 14. As such, defendant contends, the ALJ was not required to consider them in his RFC assessment.

In Molina, the Ninth Circuit explained that an "ALJ's failure to comment upon lay witness testimony is harmless where the same evidence that the ALJ referred to in discrediting the claimant's claims also discredits the lay witness's claims." 674 F.3d at 1122 (internal quotation marks and brackets omitted); see also Stout v. Commissioner, 454 F.3d 1050, 1056 (9th Cir. 2005) (reviewing court cannot consider the ALJ's error in failing to discuss lay testimony to be harmless "unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination.").

Some of the testimony provided by the lay witnesses appears to relate to plaintiff's non-severe impairments of depression and post-traumatic stress disorder, but some of the testimony appears to relate to her borderline intellectual functioning and her severe impairments which are supported by substantial evidence in the record. To the extent the testimony relates to the non-severe impairments, it was harmless error to fail to discuss it. But, because some of the testimony relates to severe impairments, any error in expressly discussing it is not harmless.

29 - OPINION & ORDER

V.  The RFC

I agree with plaintiff that because of the ALJ's errors as discussed above, the RFC is not based on substantial evidence which in turns renders the ALJ's conclusions that she can perform her past relevant work at the dry cleaning business, or alternatively, that she can perform work existing in significant numbers in the economy, unsupported by the record.  In particular, the ALJ failed to account for the limitations assessed by Dr. Schmidt based on the finding of borderline intellectual functioning, and failed to account for the limitations assessed by Dr. Espino and Dr. Ferrero.  While the ALJ also failed to account for Dr. Yang's and Dr. Blumenstein's separate determinations that plaintiff was unable to work for separate six-month periods, because neither of those determinations establishes disability for a twelve-month period, they are not conclusive as to whether plaintiff has established disability under the SSA.

Accordingly, the case must be remanded to the ALJ for further proceedings, including formulation of a new RFC consistent with the improperly rejected limitations discussed here, and a determination as to whether under that new RFC, plaintiff can return to her prior relevant work at step four or alternatively, can perform other work in the economy at step five.

CONCLUSION

The Commissioner's decision is reversed and remanded for further proceedings.

IT IS SO ORDERED.

Dated this _____ day of _____, 2013

Marco A. Hernandez
United States District Judge

30 - OPINION & ORDER